# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### January 6, 2015 Session

## STATE OF TENNESSEE v. JERALD JEFFERSON

**Appeal from the Criminal Court for Shelby County**
**No. 11-05625     Lee V. Coffee, Judge**

---

**No. W2014-00784-CCA-R3-CD  -  Filed June 25, 2015**

---

The defendant, Jerald Jefferson, was convicted of aggravated rape and sentenced to confinement for twenty-five years.  On appeal, he argues that this court should utilize a plain error review to consider his claims that the trial court erred in its jury instructions regarding eyewitness testimony and admission by silence, that the State engaged in prosecutorial misconduct in its closing argument, and that the aggregate effect of trial errors entitles him to a new trial.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and ROGER A. PAGE, JJ., joined.

Neil Umsted (on appeal) and Charles Waldman (at trial), Memphis, Tennessee, for the appellant, Jerald Jefferson.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Terre Fratesi, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The victim in this matter reported to police officers in 2002 that she had been raped.  At the time, she was a sixteen-year-old high school student.  A DNA sample was taken from her, but the matter was dormant until 2010, when a DNA sample taken from the defendant was determined to match the sample taken from the victim in 2002.  He was indicted for aggravated rape in 2011 and convicted of this offense.  After the motion for new trial had been overruled, substitute appellate counsel was appointed.  He filed a

timely notice of appeal. Since the issues presented by this appeal were neither objected to at trial nor raised in the motion for new trial, we will determine whether we may utilize a plain error review in our consideration.

The State's first witness was Memphis Police Officer Raymond Anthony Owens, who testified that, on October 4, 2002, he received a call from the dispatcher to go to a business address on Elvis Presley Boulevard. When he arrived, an EMS technician was completing an examination of the victim. Officer Owens described the victim as having "clothing [that] was in disarray. Her hair was kind of messed up. She was upset, crying." She told him what had happened:

> She said she was in front of Trezevant High School. Somebody came up behind her, put something over her head, put her inside of a vehicle. She thinks there w[ere] about three attackers. And while they drove around, they sexually assaulted her. They held her down and sexually assaulted her.

Officer Owens then transferred the victim to the rape crisis center, where she was examined and a DNA sample was taken.

The victim's mother next testified, saying that the victim was the middle of three daughters. In 2002, the victim attended Trezevant High School, where she was on the track team and played volleyball, as well as the clarinet and the drum for the school band. She was a "good child" and "as far as being a liar or giving . . . a lot of trouble, she didn't do that." On October 4, 2002, the victim was to call from school when she was ready to be picked up and brought home. Around 3:00 p.m. that day, the witness received a telephone call from McClain Motors on Elvis Presley Boulevard, telling her that the victim "was there and she had been hurt." The victim had called her stepfather, and he and her mother went to McClain Motors. When they arrived, the victim was "hysterical." Her mother further described her condition:

> I don't think she had on a shirt. I know she didn't have on shoes. Her hair was pulled – like it had been in a ponytail, so pulled – she was in bad shape. She was in bad shape.
>
> . . . .
>
> She wasn't physically . . . beaten, no. Crying. Hysterical, really. It was . . . bad. If you seen your child like this, you would understand. It was bad.

2

The victim testified that, at the time of trial, eleven years after the rape, she was twenty-seven years old, working as a security officer, and living with her parents. She had graduated both from high school and Southwest Tennessee Community College. She said that, on October 4, 2002, she had been at school and was leaving to return home, as her mother had instructed, when she heard a person she knew as "Antonio" call her name. She described what happened next:

> So I walked over, and then the next thing you know, there was a bag being put on my head, and people were pulling me, and I was hearing yelling, and I was yelling, and I was drug into the car.
>
> We rolled around for a long time, you know. If your head is covered, it can only be a long time, you know. So we drove around and drove around and drove around. And I heard whispering. And we pulled over somewhere, and I can remember them snatching my clothes off. I can remember people holding me down. I can remember me screaming, "Stop it. No. What are you doing? Let me go." I'm blind, so I can't see without my glasses. I can remember them taking everything that I had.
>
> When they finally finished, they never said anything to me. And they let me out and . . . everything in me was gone. And I was scared. And I called my dad. And he told me to call Mom. And I called Mom. And then everybody came.

The victim said that there were three men in the car, including Antonio. Otherwise, she was unable to describe them. She remembered the men grabbing her arms and legs, holding a bag on her head, and "being in the back seat on [her] back." The car stopped, and she was raped. The car door then opened, and she was pushed out. She walked to McClain Motors, where she was helped and her mother and father were called, as well as an ambulance. Her parents arrived, and she later went to the rape crisis center, where she was examined.

Kevin McClain testified that he was the owner of McClain Motors and, when the victim walked in, she was not wearing shoes, looked "dazed and confused," and said that she had been raped. He telephoned the police department but did not ask the victim what had happened.

Judy Pinson testified that she was a nurse practitioner at the Memphis Rape Crisis Center. She said the victim had been examined at the Center in 2002, and a sub-acute abrasion about one centimeter in length was found on her vulva. Pinson believed it to be a penetrating injury. Pinson took DNA samples from the victim.

3

Lieutenant Stephen Cody Wilkerson testified that he was employed by the Memphis Police Department and was in charge of the Sex Crimes Cold Case Unit. On January 3, 2011, he was assigned to work on the victim's case, and there had been a match made with the DNA from the victim's rape kit and a Tennessee Bureau of Investigation ("TBI") profile of DNA taken from the defendant. The defendant was contacted and voluntarily came to police headquarters. He was not arrested but was advised of his <u>Miranda</u> rights before being questioned. The defendant consented to having another DNA sample taken from him. The defendant responded to questions asked of him, and Lieutenant Wilkerson described the defendant's actions when told of the DNA evidence:

> [U]p to that point, he was a little nervous, but he was engaged in conversation. He would look at me, he'd make eye contact with me, he would answer questions, . . . he asked a couple of questions.
>
> Once . . . I told him that we had recovered DNA evidence from the rape kit that was collected after [the victim] was assaulted and taken to Rape Crisis, I told him that we recovered his DNA from inside her vagina.
>
> At that point, he just stopped talking. He just looked down at the floor, wouldn't say a word, wouldn't move. We sat there for a long time. We were in the interview room for about an hour and twenty minutes. Probably the last twenty minutes was just sitting there with him staring at the floor.

Lieutenant Wilkerson continued that his reason in asking for a second DNA sample from the defendant was for a confirmatory test. Since the results from the second test were not yet available, the defendant was allowed to leave following his being questioned.

Deanna Lankford testified that she was employed as Associate Laboratory Director for Cellmark Forensics, a private forensic DNA testing laboratory. She said that she had testified as a DNA expert witness "[c]lose to" fifty times in criminal, federal, and military courts, in "many different states." She said that she had received slides prepared with samples taken from the victim's sexual assault kit and that the presence of semen was detected. As a result of the testing, a DNA profile was created and returned to the TBI in 2005.

Lawrence James testified that he was employed by the TBI as a special agent and forensic scientist supervisor. He said that he had provided expert testimony in courts

regarding DNA approximately seventy-five times. The DNA profile from Cellmark had been uploaded into CODIS in 2006, and, in November 2010, he was told that the profile matched that of the defendant, Jerald Jefferson. This result was reported to Shelby County authorities, and the TBI asked that, for confirmation purposes, a second DNA sample be taken from the defendant. Special Agent James then received and tested this second sample and concluded that the DNA from the defendant's second swab matched that found on the vaginal swab from the victim's rape kit. He said that among African-Americans, the race of the defendant, he would expect to see this profile once in 40 quadrillion, 870 trillion. The State then rested its case.

Following this testimony, the defendant rested without presenting any evidence.

## ANALYSIS

On appeal, the defendant acknowledges that since the issues presented in this appeal were neither objected to at trial nor raised in the motion for new trial, we must utilize a plain error review in considering them. See Tenn. R. App. P. 3(e) (providing for waiver of issues not specifically stated in a motion for new trial); State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010) (stating that a defendant waives those issues not raised in a motion for new trial and those issues are subject to plain error review). In order for us to find plain error: (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice." State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). The presence of all five factors must be established by the record before we will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. Id. at 283.

Applying that standard, we will review the issues raised on appeal by the defendant.

## I. Trial Court Erred in Charging the Jury Regarding Witness Testimony

The defendant argues that the trial court erred in charging the jury that the testimony of one witness was sufficient to support a conviction. The court's complete instructions regarding identification testimony is as follows, with the assailed testimony in italics:

5

The Court charges you that the identity of the defendant must be proven in the case on the part of the State to your satisfaction beyond a reasonable doubt. In other words, the burden of proof is on the State to show that the defendant now on trial before you is the identical person who committed the alleged crime with which he is charged. In considering the identity of a person, the Jury may take into consideration all the facts and circumstances in the case.

Again, the State has the burden of proving every element of the crime charged, and this burden specifically includes the identity of the defendant as the person who committed the crimes for which he is on trial. If after considering the identification testimony in light of all the proof you have a reasonable doubt that the defendant is the person who committed the crimes, you must find the defendant not guilty.

The reliability of an in-court identification depends on the totality of the circumstances, including the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the prior description of the offender, the level of certainty of the witness at the confrontation and the length of time between the crime and the confrontation. *The credible testimony of one identification witness is sufficient to support a conviction if the witness viewed the accused under such circumstances as would permit a positive identification to be made. The Court charges you that the credible testimony of one victim or one witness, standing alone, is sufficient to support a conviction.*

The Court further charges you that if you are satisfied from the whole proof in the case, beyond a reasonable doubt, that the defendant Jerald Jefferson committed the crimes charged against him, and you are satisfied beyond a reasonable doubt that he has been identified as the person who committed the crimes charged, then it would be your duty to convict him. On the other hand, if you are not satisfied with the identity from the proof, or you have a reasonable doubt as to whether he has been identified from the whole body of the proof in the case, then you must return a verdict of not guilty.

In considering the defendant's claim in this regard, we first note that, at the outset of the trial, in response to the court's asking if the defense was going to be consent by the victim, defense counsel responded, "Correct," adding that he expected testimony from an expert witness presented by the State that "there was actually semen found in [the victim] that appears to be or could be from partners other than [the defendant]." As to this

6

instruction, the defendant argues that the now objected-to language "misdescribed the quantum of proof necessary to satisfy proof beyond a reasonable doubt."

As previously set out, the victim testified that she was blindfolded during the rape and, in response to a question asked during cross-examination, said she did not forget faces and that the defendant's face was one she had "never seen before." Thus, the State's proof against the defendant did not include eyewitness identification testimony by the victim or anyone else. Further, we note that the objected-to language is in the identity section of the instructions and not that as to reasonable doubt.

Two previous opinions of this court are relevant to the assailed special jury instruction. In State v. David Michael Chubb, No. M2005-01214-CCA-R3-CD, 2007 WL 258429, at *16 (Tenn. Crim. App. Jan. 29, 2007), the same instruction was given to the jury, over the defendant's objection. Observing that the case "essentially presented to the jury a question of credibility between the victim and the appellant . . . the jury instruction effectively informed the jury that they need look no further than the victim's testimony to convict and thus implied that the jury need not consider all other proof." Id. In State v. David Richardson, No. W2013-01763-CCA-R3-CD, 2014 WL 6491066, at *20 (Tenn. Crim. App. Nov. 20, 2014), this court concluded that the giving of the instruction was error which was "harmless beyond a reasonable doubt because the proof identifying [the defendant] as the perpetrator did not depend on a single eyewitness's testimony." The court explained that "[t]here were no eyewitnesses who saw [the defendant] committing the offenses in this case"; and, viewing the charge as a whole, it was "clear that the challenged special instruction referred to eyewitness testimony, despite the fact that there were no eyewitnesses identifying [the defendant] as the shooter." Id. Accordingly, the defendant was not entitled to plain error relief because he failed to show that a substantial right had been adversely affected and that consideration of the error was necessary to do substantial justice.

Applying that same reasoning to the present appeal, we, likewise, conclude that the defendant is not entitled to plain error review as to the erroneous jury instruction. Neither the victim nor any other witness provided eyewitness testimony as to the defendant's sexually assaulting the victim. Instead, he was arrested, charged, and convicted of the offense based upon cold case review of DNA recovered from the victim. Therefore, neither a substantial right of the defendant was violated, nor is consideration of the matter necessary to do substantial justice. Thus, we decline to utilize a plain error review as to this issue.

This assignment is without merit.

## II. State's Reference During Closing Argument to
## Defendant's Silence After Being Told Of DNA Results

The specific trial testimony which was the basis for the State's allegedly improper argument was given by Lieutenant Wilkerson. As he was recounting his questioning of the defendant, who had been denying any knowledge of the incident, Lieutenant Wilkerson described the defendant's response upon being told that his DNA matched the sample taken from the victim, saying that the defendant then "wouldn't say a word, wouldn't move," but was sitting and staring at the floor for twenty minutes. That testimony was recounted, in turn, during the State's closing argument:

> And after being advised of his Miranda rights, what the Defendant said was, "I don't know her. I don't know [the victim]. I don't know Antonio Starks. I've never been to Trezevant High School. I've never had sex with someone who had a hood or a pillow or a cloth item over her head. I never had sex with someone while other people watched. No, no, no.

> And then, being the seasoned detective that he is and having already gotten this DNA swab, Lieutenant Wilkerson dropped the bomb and said, "Well, we've got your DNA in her rape kit. And this swab you just gave me is going to prove it." And that's when the head dropped to the floor and the twenty minutes of silence began. What do you think he was thinking during those twenty minutes? . . . I suggest to you that maybe he was thinking, other than an initial expletive in his mind, he was caught. Maybe he was thinking about October 4th of 2002 and a split second moment in time when he made a decision to commit an act of violence against another human being. That was when he chose was October 4th, 2002. Maybe he was thinking about that day.

The failure to object to closing argument at trial waives our consideration of this issue on appeal. See Tenn. R. App. P. 36(a); State v. Stephenson, 195 S.W.3d 574, 601 (Tenn. 2006); State v. Thomas, 158 S.W.3d 361, 413 (Tenn. 2005); State v. Little, 854 S.W.2d 643, 651 (Tenn. Crim. App. 1992) (holding that the defendant's failure to object to the State's alleged misconduct during closing argument waives that issue). Thus, the defendant is not entitled to relief on appeal unless the remarks constitute "plain error." See Tenn. R. App. P. 36(b); State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000).

In response to a question from the State, as to whether the defendant was "charged or arrested" the day he met with Lieutenant Wilkerson at the police department, Lieutenant Wilkerson earlier had responded that, following their conversation, he "opened up the door and let [the defendant] walk right out." However, on appeal, the

defendant, in pointing to prosecutorial misconduct, points to cases reviewing comments about post-arrest silence. Since the defendant made no claim, either by pretrial motion or during the trial, that he had believed he was in custody at the time of his statement and then silence, we have no basis to review this matter as the State's commenting on post-arrest silence. Accordingly, it is not necessary that we review this issue because a substantial right of the defendant was not affected.

As to the defendant's arguing that the State improperly recounted during final argument his lengthy silence when told of the DNA results, we already have reviewed the fact that testimony regarding this matter was not objected to during the testimony of Lieutenant Wilkerson. Accordingly, what we are left with is the State's recapping trial testimony, which included the facts that the defendant had been advised of his <u>Miranda</u> rights, had voluntarily made a statement to Lieutenant Wilkerson, was not arrested, and left the police station following the statement. Thus, the cases relied upon by the defendant regarding the post-arrest silence of a defendant are not relevant. Accordingly, we conclude that this issue is without merit.

Further, the defendant argues that the State, during the rebuttal argument, made improper references to DNA evidence in general and to another case involving such proof. More specifically, he asserts the State argued DNA evidence was particularly valued by jurors and, in detailing a previous rape case, how, following that trial, a news reporter had asked if there had been a prior relationship between the victim and the defendant. The State recounted this previous case that, in rape prosecutions with DNA evidence, it was not uncommon for defendants to question the character of the victim rather than challenge the scientific results.

Since counsel who represented the defendant during the trial did not object to these two lines of argument, we determine first whether they constitute plain error. We conclude that they do not. Since the arguments appear to be a response to the defendant's comments regarding the victim's character, no clear and unequivocal rule of law was breached. Likewise, given the fact that the DNA sample from the victim matched that from the defendant, we cannot conclude that our considering them is necessary to do substantial justice. Accordingly, this issue is without merit.

### III. Jury Instructions Regarding Admissions Against Interest

The defendant complains that the trial court instructed the jury regarding admissions against interest although the record was "devoid of any proof that supported this charge."

In <u>Ledune v. State</u>, 589 S.W.2d 936, 939 (Tenn. Crim. App. 1979), the court explained the admission by silence doctrine:

> [W]hen a statement is made in the presence and hearing of one accused of an offense and the statement tends to incriminate him, or is of an incriminating character, and such statement is not denied or in any way objected to by him, both the statement and the fact of his failure to deny it or make any response to it, is admissible against him as evidence of his acquiescence in its truth.

In this matter, the defendant denied having sexual relations with the victim, but after being told of the DNA results, he became silent for a period of minutes, looking at the floor. Certainly, a reasonable jury could have concluded that his failing to respond or explain was incriminating. Further, we note that trial counsel had not objected to the testimony regarding the defendant's reaction to the DNA information, nor did counsel object when given the earlier opportunity to review the proposed jury instructions before they were read to the jury. Accordingly, we conclude that this objection is waived, and even if that were not the case, it is harmless error.

## IV. Cumulative Error

The defendant asserts on appeal that, because of cumulative error occurring during the trial, he was deprived of a fair trial. As set out previously, we have considered each of these claims of trial errors and concluded that none may be reviewed as plain errors. Accordingly, since they may not be considered individually, they may not be considered as a group.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE